UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KENDY MATOS,

                                   **Plaintiff,**

          *- against -*

NANCY A. BERRYHILL, ACTING COMMISSIONER
OF SOCIAL SECURITY,[1]

                                 **Defendant.**

13 CV 5062 (KMK)(LMS)

**REPORT AND
RECOMMENDATION**

**TO: THE HONORABLE KENNETH M. KARAS, U.S.D.J.**

Plaintiff Kendy Matos brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"), which denied her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") payments. ECF No. 2. Each party has submitted a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ECF Nos. 24, 26. For the reasons discussed below, I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion for judgment on the pleadings (ECF No. 24) be denied, Plaintiff's motion (ECF No. 26) be granted, and the case be remanded to the Agency for further proceedings consistent with this opinion.

---

[1] Ms. Berryhill is the current Acting Commissioner of Social Security, effective January 23, 2017, and is automatically substituted herein as Defendant pursuant to Fed. R. Civ. P. 25(d).

# I.   BACKGROUND

## A.   Procedural History

Plaintiff protectively filed claims for DIB (AR 185-89) and SSI (AR 190-97) on March 27, 2010.[2] In both applications, she alleged April 5, 2009, as the onset date of her disability. AR 185, 190. By correspondence dated June 18, 2010, the Social Security Administration (the "SSA" or "Agency") denied Plaintiff's applications. AR 65-70. On July 2, 2010, Plaintiff requested a hearing before an administrative law judge ("ALJ") (AR 71), and on October 28, 2011, the hearing was held. AR 33-56. Shortly thereafter, on November 25, 2011, the ALJ issued an unfavorable decision. AR 11-25. On December 23, 2011, Plaintiff filed a request for review of the ALJ's decision with the Appeals Council, which was denied on June 24, 2013. AR 1-7. Accordingly, the ALJ's November, 2011, decision became the final action of the Commissioner.

The instant lawsuit followed. ECF No. 2. In her papers, Plaintiff argues that the Commissioner's findings are contrary to law and regulations promulgated pursuant to the Social Security Act (the "Act") and not supported by substantial evidence. ECF No. 2. She asks this Court to reverse the Commissioner's decision and award benefits, or in the alternative, to vacate the decision and remand the matter to the Agency for further proceedings. ECF No. 2, at 3.

## B.   Evidence Before the ALJ

### 1.   FEGS WeCare

Plaintiff was first evaluated by Luz Rivera, a social worker at the Federation Employment &

---

[2] Citations to "AR" refer to the certified copy of the administrative record filed by the Commissioner as part of her answer. See ECF No. 18.

Guidance Service ("FEGS"),[3] on September 25, 2009. AR 298. Plaintiff presented with severe depression triggered by her recent arrest and termination from her job as a teacher's aide. AR 303-05.[4] Plaintiff informed Ms. Rivera that she was diagnosed with depression and anxiety in August, 2009, and currently receiving mental health services at the St. Mark's Place Institute for Mental Health ("St. Mark's Place"). AR 305. She was compliant with her medications and saw her therapist once each month. AR 305.

Plaintiff scored a 19 on a PHQ-9 test, which is commensurate with a diagnosis of severe depression. AR 306. She often experienced feelings of low self-worth. AR 305. Nearly every day, Plaintiff indicated to Ms. Rivera, she felt down, depressed, hopeless, tired, and as though she let herself and her family down. AR 305. Plaintiff described concentration problems as well. AR 306. She lost energy and pleasure in doing things, but never demonstrated suicidal or homicidal ideation. AR 305-06. Plaintiff, who, due to her pending criminal case, had curfew between 9:00 PM and 6:00 AM, spent most days in the three-bedroom apartment she shared with her mother. AR 300, 306-07. She was able to travel independently by public transportation and engage in a full range of daily activities. AR 306.[5]

---

[3] FEGS was a nonprofit health and human service organization which, through its member programs, "help[ed] public assistance applicants and recipients with complex clinical barriers to employment" through mental and medical health treatment, vocational and educational training, as well as job and internship placement. See, e.g., Bronx Reentry Working Group: FEGS: WeCARE, Bronx Reentry Working Group, http://bronxreentry.org/fegs-wecare (last visited April 21, 2017)

[4] Plaintiff was arrested in connection with her involvement in a robbery, which she ultimately pleaded guilty to. See United States of America v. Matos et al, No. 09-cr-457 (PGG) (S.D.N.Y.), ECF No. 75; see also AR 519-20.

[5] Plaintiff was capable of participating in each of the 13 daily activities listed on Ms. Rivera's checklist, including cooking meals, shopping for groceries, making her bed, and washing clothes and dishes. AR 306.

Also on September 25, 2009, Dr. Nichele Nivens of FEGS conducted a physical evaluation of Plaintiff. AR 309-14. The examination was overwhelmingly normal (AR 310), save for intermittent left abdominal pain which Dr. Nivens attributed to a left tubal ectopic pregnancy Plaintiff was treated for on May 22, 2009. AR 275-96, 311.[6] At its worst, Plaintiff self-scored her abdominal pain as a six on a ten-point scale. AR 311. In addition to depression, Plaintiff experienced loss of appetite, insomnia, and weight loss, symptoms which began in March, 2009, when she was arrested. AR 311. Plaintiff lost 40 pounds since the arrest. AR 313. Additionally, she began experiencing anxiety attacks, which brought on shortness of breath, leg weakness, and palpitations. AR 313. At the time she met with Dr. Nivens, Plaintiff took Lexapro and Klonopin, and met with a psychiatrist monthly and a therapist weekly. AR 313.[7] Dr. Nivens' final diagnoses included mood disorder, intermittent left abdominal pain, and "significant unintentional weight loss." AR 313.

Plaintiff's next FEGS examination occurred on October 6, 2009, when she met with Dr. Ophelia Villar. AR 344. Plaintiff complained of a depressed mood, loss of appetite, severe headaches, poor concentration, panic, insomnia, a rapid heart rate, forgetfulness, nightmares,

---

[6] "An ectopic pregnancy occurs when a fertilized egg implants somewhere other than the main cavity of the uterus ... [and] most often occurs in one of the tubes that carry eggs from the ovaries to the uterus (fallopian tubes). This type of ectopic pregnancy is known as a tubal pregnancy." Diseases and Conditions: Ectopic pregnancy, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/ectopic-pregnancy/basics/risk-factors/con-20024 262?amp%3BMETHOD=print&p=1 (last visited Apr. 21, 2017).

[7] Klonopin, or Clonazepam, is used to treat panic attacks and certain seizure disorders. Drugs and Supplements: Clonazepam (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102 (last visited April 21, 2017). Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder. Drugs and Supplements: Escitalopram (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/escitalopram-oral-route/description/drg-20063707 (last visited Apr. 21, 2017).

anxiety, and crying spells. AR 344. Upon conducting a mental status examination, Dr. Villar noted

that Plaintiff had a depressed mood and constricted affect; nevertheless, her thought content was

normal and logical, and she did not possess any suicidal or homicidal ideations. AR 344. Though

Plaintiff was tearful during the examination, she remained alert and oriented. AR 344.

Dr. Villar diagnosed major depressive disorder and panic disorder without agoraphobia. AR

346. She found that Plaintiff possessed severe limitations in maintaining attention, dealing with the

public, and adapting to stressful situations. AR 346. Plaintiff demonstrated moderate impairments

in her abilities to accept supervision, follow work rules, relate to coworkers, and adapt to change.

AR 346. Dr. Villar gave Plaintiff a global assessment of functioning ("GAF") score of 50, which

indicates a serious impairment in social or occupational functioning. AR 346.[8] Dr. Villar found

that, due to these conditions, Plaintiff was temporarily disabled from work, and would remain so for

at least six months. AR 346.

### 2. Consultative Examiners

#### a. Dr. Dimitri Bougakov

Plaintiff presented to Dr. Dimitri Bougakov, PH. D., on May 24, 2010, for a consultative

examination. AR 421. Dr. Bougakov noted that Plaintiff was last employed approximately one

year prior as a paraprofessional responsible for assisting special education teachers, but she had

since stopped working "because of her legal problems." AR 421. At the time of the consultative

examination, Plaintiff saw a psychiatrist by the name of Dr. Nuñez on a monthly basis, and a

therapist, one Mr. Muntasser, twice each week. AR 421. Both of these treating sources were

---

[8] The GAF tests a patient's level of functioning along a continuum of mental health, from 1
to 100. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental
Disorders 32-34 (4th ed. 2000).

affiliated with St. Mark's Place. AR 421. Plaintiff took Lexapro and Klonopin twice daily, but still experienced a plethora of symptoms which affected her daily functioning, and which originated after her arrest. AR 421-22. She described, for instance, depressive moods, crying spells, insomnia, weight loss and poor appetite, low energy, chest pain, social withdrawal, and forgetfulness. AR 421.

Plaintiff was cooperative and related adequately with Dr. Bougakov during the examination, though her posture was "somewhat tense" and her motor behavior seemed "restless." AR 422. She had a dysthymic mood, as well as a dysphoric and anxious affect. AR 422. Dr. Bougakov found Plaintiff to be alert, with intact attention and concentration. AR 422. Plaintiff's thought process was coherent and goal directed, her sensorium clear, and her speech fluent. AR 422. Her recent and remote memory skills, however, were mildly impaired due to anxiety and nervousness. AR 422. Plaintiff could repeat three out of three objects immediately, and two of three objects after five minutes. AR 422, 424. She demonstrated average intellectual functioning coupled with fair insight and judgment. AR 424. Plaintiff reported that she was able to manage money, travel by public transportation, and occasionally socialize with friends. AR 424. She had a good relationship with her family, and spent her days watching television, listening to the radio, reading the bible, and attending appointments and church. AR 424.

Dr. Bougakov concluded that Plaintiff's symptoms seemed to "be consistent with stress-related problems," but did not, in themselves, "appear to be significant enough to interfere with [Plaintiff]'s ability to function on a daily basis." AR 424. Plaintiff could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, make appropriate decisions, and maintain a regular schedule. Plaintiff was somewhat limited in her capacity to learn new tasks and perform complex tasks. AR 424. Her ability to deal with stress

and others was also somewhat limited. AR 424.

Dr. Bougakov diagnosed depressive and anxiety disorder, not otherwise specified ("NOS"). AR 424.[9] Plaintiff's prognosis was fair; Dr. Bougakov noted that Plaintiff did not "present with significant cognitive limitations," and believed her "psychiatric symptomology should be controlled with appropriate treatment." AR 424.

### b. Dr. Sharon Revan

Dr. Sharon Revan, M.D., also saw Plaintiff on May 24, 2010, for a consultative evaluation. AR 425. In addition to the psychiatric symptoms discussed above, Plaintiff reported a sharp, throbbing, and intermittent abdominal pain on the left side. AR 425. Her discomfort began after the removal of her left fallopian tube, as a result of an ectopic pregnancy, nearly one year earlier. AR 425. Plaintiff also had knee pain, and described feeling tired, after walking more than four or five blocks. AR 425. Sitting caused her lower back pain, and standing produced leg pain, though lying down did not result in any discomfort. AR 425. Plaintiff experienced shortness of breath when climbing three flights of stairs. AR 425. She could perform activities of daily living that were not related to work, like cooking, shopping, and laundry. AR 426. Dr. Revan noted that Plaintiff had a normal gait and stance, and a full squat. AR 426. Plaintiff did not appear to be in any acute distress, and could walk on her heels and toes without difficulty; she needed no help changing for the examination, getting on and off the examination table, or rising from a chair. AR 426. Plaintiff's physical examination was overwhelmingly normal; her skin and lymph nodes, eyes, ears, nose, throat, neck, chest and lungs, heart, abdomen, muscoskeletal system, and extremities revealed unremarkable findings. AR 426-27.

---

[9] He also diagnosed Plaintiff with cardiac angina, though the etiology of the condition was unknown. AR 423.

Dr. Revan diagnosed depression, mood change, lack of concentration, and abdominal pain; Plaintiff's prognosis was fair. AR 427. According to Dr. Revan, Plaintiff had no limitations in her upper extremities for fine and gross motor activity, or with her speech, vision, or hearing. AR 428. Plaintiff had mild limitations with walking distances due to fatigue and knee pain, and climbing stairs due to shortness of breath. AR 428. She was also limited in her ability to sit due to back pain, and in her ability to stand due to leg pain. AR 428. Plaintiff had no limitations in performing activities of daily living. AR 428.

### 3.    Letters from Plaintiff's Treating Professionals at St. Mark's Place

Also part of the administrative record considered by the ALJ were letters submitted from Dr. Giovanny Nuñez, Plaintiff's treating psychiatrsit, and Mr. Niezar Muntasser, LCSW, her therapist, at St. Mark's Place. AR 28.

#### a.    Dr. Giovanny Nuñez

By letter dated September 30, 2010, addressed to the Human Resource Administration, Dr. Giovanny Nuñez confirmed treating Plaintiff at St. Mark's Place for depressive disorder and post traumatic stress disorder ("PTSD"). AR 515. Plaintiff took Lexapro and Klonopin, and received psychotherapy treatment twice each week and psychiatric treatment on a monthly basis. AR 515. Dr. Nuñez wrote that, due to Plaintiff's "diagnoses and psychiatric symptoms she is unable to participate in work related activities for at least 12 months." AR 515.

#### b.    Niezar Muntasser, LCSW

On October 27, 2011, Niezar Muntasser, a licensed clinical social worker ("LCSW"), confirmed, by letter, that he began treating Plaintiff on July 16, 2009. AR 517. Plaintiff was referred to Mr. Muntasser by her Pretrial Services Officer after exhibiting symptoms of severe depression. AR 517. Mr. Muntasser, who had seen Plaintiff on a weekly basis, wrote that, despite

treatment, Plaintiff continued to suffer from insomnia, impaired concentration, anhedonia, social isolation, and more intense feelings of depression and PTSD. AR 517. Plaintiff also reported experiencing both visual and auditory hallucinations. AR 517.

### 4.    Bureau of Prisons Health Services

Plaintiff began her 366-day term of incarceration at Federal Correctional Institution ("FCI"), Danbury, on December 3, 2010. AR 520. On December 9, 2010, she met with Dr. Diane McLean, a psychiatrist, complaining of a depressed and anxious mood, and poor sleep. AR 506. Tearful throughout the interview with Dr. McLean, Plaintiff appeared dysphoric and moderately anxious. AR 506. Her affect was anxious, constricted, and depressed. AR 506. Dr. McLean diagnosed chronic anxiety, temporary depressive disorder, and assigned a GAF score in the range of 51-70. AR 507.[10]

On December 22, 2010, Plaintiff met with Dr. Tiffany Sanders of the Bureau of Prisons Health Services Office, complaining chiefly of a history of depression and abdominal pain. AR 499. Plaintiff appeared alert and oriented, and no abnormal findings were made with respect to her mood or thought processes. AR 499-500. Dr. Sanders diagnosed anxiety and depressive disorder, NOS; she assigned the same GAF range of 51–70. AR 500.

Dr. Karen Brody first met with Plaintiff on December 29, 2010. AR 495. Plaintiff appeared agitated, distressed and moderately anxious. AR 495. Her mood was down, and she was tearful during the evaluation, particularly when discussing her incarceration and the trouble she had adjusting to life in prison. AR 495. Nevertheless, Plaintiff denied suicidal thoughts or intent, noted

---

[10] A GAF score in this range corresponds to moderate to mild symptoms. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32-34 (4th ed. 2000).

having a supportive family, and, as Dr. Brody wrote, looked "forward to having a job to occupy some of her time." AR 495. A physical examination was generally normal, though Dr. Brody noted Plaintiff's affect was anxious and her mood sad and worrisome. AR 495-96. Plaintiff's diagnoses, and GAF score, remained the same. AR 496.

On February 1, 2011, Plaintiff returned to the Bureau of Prisons Health Services Office once more, though this time she complained of pain in her right knee and ankle. AR 491. She had missed a step and fallen down a flight of stairs on her way to dinner. AR 491. According to LoriAnn Beaulieu, the registered nurse ("RN") who examined Plaintiff, Plaintiff had mild swelling to the medial and lateral parts of her right ankle and moderate swelling of the right knee. AR 491. Plaintiff rated her pain as an eight on a ten-point scale. AR 491. RN Beaulieu instructed Plaintiff to apply ice to the affected areas, take ibuprofen, and return for a follow-up visit within two to three days. AR 491.[11]

When Plaintiff presented again to the Health Services Office on February 7, 2011, she met with Rosemary Johnson, an advanced practice registered nurse ("APRN"), reporting right knee pain. AR 488. Plaintiff described a history of right knee pain, beginning in 2010, which she rated at a level of nine out of ten. AR 488. She also complained of right ankle pain, stemming from the fall one week prior. AR 488. Upon conducting a physical examination, APRN Johnson noted that Plaintiff was alert and oriented, but appeared "weepy at times" and anxious. AR 488. Despite swelling and effusion, Plaintiff had full range of motion, flexion, extension, and internal/external rotation in her right knee. AR 488. The same was found as to Plaintiff's right ankle. AR 489.

---

[11] Plaintiff also complained of a previous injury to her right knee (AR 491), but Darin D. Daly, an administrator with the Health Services Office, noted that, upon review of Plaintiff's record, she "discovered [that Plaintiff] has never mentioned anything about a [r]ight knee injury at any clinical encounter or even intake screening." AR 494.

APRN Johnson diagnosed knee and joint pain in the lower leg, and an acute sprain of the foot, pending the results of follow-up X-rays. AR 489. In addition, Plaintiff was given a lower bunk for one month, instructed to apply ice to the affected areas twice daily, and to keep her leg and ankle elevated. AR 489. The X-rays of her right ankle and knee, taken on February 8, 2011, came back negative. AR 485.

On February 16, 2011, Plaintiff's pain level and swelling had improved significantly. AR 484. She reported to APRN Johnson that her discomfort was now at a level of one or two on a ten-point scale. AR 484. APRN Johnson encouraged Plaintiff to begin routine exercise, in order to better her range of motion and reduce stress. AR 485.

Plaintiff presented to APRN Johnson once again on April 8, 2011, reporting leg pain and "numerous other vague" mental health complaints. AR 480. Her mood was melancholic and detached. AR 481. As to her lower extremities, Plaintiff described the onset of a new pain in her left knee, which she rated as a five out of ten. AR 480. With respect to her other symptoms, Plaintiff experienced dizziness, difficulty sleeping, amenorrhea, and stomach pain on the left lower quadrant, with associated symptoms of nausea and vomiting. AR 480. She denied intent to harm herself or others, and informed APRN Johnson that she had "no friend[s]" at the prison and did not "trust anyone outside correctional staff [.]" AR 480. A physical examination was normal, and, once again, Plaintiff demonstrated full and healthy ranges of motion with respect to her knees. AR 481. In APRN Johnson's opinion, Plaintiff demonstrated depressive disorder, NOS, and seemed to "be having adjustment issues." AR 482. A new prescription, increasing the dosage of Mitrazapine from 15 to 30 mg, was issued to treat Plaintiff's depression. AR 482.[12]

---

[12] Mirtazapine is an antidepressant. <u>Drugs and Supplements: Mirtazapine (Oral Route)</u>, Mayo Clinic,

Plaintiff met with Dr. Brody on April 25, 2011; Dr. Brody found that her depression persisted. AR 478. Plaintiff was "distressed by incarceration, especially [the] level of noise and frequent arguing among inmates in her housing unit." AR 478. She also experienced insomnia. AR 478. While her anxiety level improved with the use of Citalopram, the increased dosage of Mitrazapine produced dizziness, weakness, and numbness in her hands. AR 478. Describing Plaintiff's activities of daily living, Dr. Brody noted that, in addition to attending a "coping skills" group, Plaintiff had a job in the recreational area and exercised regularly. AR 478. She also expressed interest in tutoring. AR 478. To combat Plaintiff's insomnia and depression, Dr. Brody recommended a trial of Doxepin. AR 478. Dr. Brody diagnosed depressive disorder, NOS, and anxiety, as she had previously, and assigned Plaintiff a GAF score in the range of 51-70, which indicated mild to moderate impairments in functioning. AR 478.

On June 13, 2011, Plaintiff returned to the Health Services Office to meet with Dr. Sanders, complaining of depression. AR 476. Plaintiff had missed most doses of her medication over the previous week, but indicated that her mood was stable. AR 476. She maintained her job, and denied any difficulty with nutrition. AR 476. Dr. Sanders conducted a mental status examination which revealed Plaintiff to be alert, oriented, pleasant, and cooperative. AR 476. Plaintiff also displayed a normal mood and affect. AR 477. Dr. Sanders diagnosed depressive disorder, NOS, and psychosocial and environmental problems related to Plaintiff's incarceration. AR 477. Plaintiff's GAF range was, once again, in the range of 51-70. AR 477.

One month later, on July 8, Plaintiff presented to Dr. Brody in a pleasant, upbeat manner, as she was looking forward to being discharged on September 11 of the same year. AR 474. Plaintiff

---

http://www.mayoclinic.org/drugs-supplements/mirtazapine-oral-route/description/drg-20067334 (last visited Apr. 21, 2017).

found her current medications of Citalopram and Doxepin to be "very effective" for managing her

depression and anxiety, producing minimal side effects. AR 474.[13] Dr. Brody noted that Plaintiff's

depressive disorder and anxiety had markedly improved, but maintained her opinion as to Plaintiff's

GAF score. AR 474.

### 5. Other Evidence

#### a. SSA Non-Examining Consultant

On June 10, 2010, Dr. E. Kamin, an SSA consultant, reviewed Plaintiff's records and

completed both a Psychiatric Review Technique form and mental residual functional capacity

("MRFC") assessment. AR 429-45. Dr. Kamin assessed Plaintiff with anxiety disorder and

depressive disorder. AR 432, 434. Plaintiff was mildly limited in activities of daily living, and

moderately limited in maintaining social functioning, concentration, persistence, or pace. AR 439.

On the MRFC assessment, Dr. Kamin found moderate limitations in the following areas: ability to

understand and remember detailed instructions; ability to carry out detailed instructions; ability to

maintain attention and concentration for extended periods; ability to perform activities within a

schedule, maintain regular attendance, and be punctual within customary tolerances; ability to

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; and ability to respond appropriately to changes in the work setting. AR 443-44. Plaintiff

---

[13] Citalopram treats depression, Drugs and Supplements: Citalopram (Oral Route), Mayo
Clinic,
http://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980
(last visited Apr. 21, 2017), and Doxepin is used to treat depression or anxiety. Drugs and
Supplements: Doxepin (Oral Route),
http://www.mayoclinic.org/drugs-supplements/doxepin-oral-route/description/drg-20072083
(last visited Apr. 21, 2017).

had no significant limitations in any other functional areas. AR 443-44. Dr. Kamin concluded that Plaintiff had the ability to perform a job limited to "simple tasks." AR 445.

### b. Dr. Ramon O. Fortuño-Ramirez

On July 27, 2011, Dr. Ramon O. Fortuño-Ramirez examined the record and completed a medical source statement ("MSS") and medical interrogatory at the request of the ALJ. AR 448-56. On the MSS, Dr. Fortuño-Ramirez found that Plaintiff was moderately limited in the following areas: the ability to make judgments on complex work-related decisions, and the ability to understand, remember, and carry out complex instructions. AR 448. Plaintiff had mild limitations in carrying out simple instructions and making judgments on simple work-related decisions. AR 448. She had no limitations in understanding and remembering simple instructions. AR 448. In support of these findings, Dr. Fortuño-Ramirez relied on the FEGS records, and Plaintiff's biospychosocial report in particular. AR 448. Dr. Fortuño-Ramirez found mild limitations with respect to Plaintiff's abilities to interact appropriately with supervisors and co-workers, and moderate impairments in her ability to interact appropriately with the public and respond appropriately to usual work situations and changes in a routine work environment. AR 449. These findings were based upon, in addition to notes from FEGS and FCI, Danbury, Dr. Bougakov's consultative examination, which found that Plaintiff suffered from daily anxiety attacks but possessed normal attention and concentration. AR 449.

On the medical interrogatory, Dr. Fortuño-Ramirez opined that Plaintiff had a history of abdominal pain and moderate depressive disorder. AR 452-53. He also found that Plaintiff's activities of daily living were mildly restricted, while she suffered moderate limitations in maintaining social functioning, concentration, persistence, and pace. AR 453. Although Plaintiff had "some limitations" due to a depressive disorder, NOS, she "received only mild medication most

14

of the time." AR 453. According to Dr. Fortuño-Ramirez, Plaintiff's impairments, considered

individually and in combination, neither met nor medically equaled the criteria of a listing 12.04 or

12.06. AR 454, 456. The above findings were based on notes from FEGS, New York Presbyterian

Hospital, Montefiore Medical Center, and Plaintiff's consultative examinations

### c.    Plaintiff's Application Materials

On a disability report accompanying her claims, Plaintiff listed mood disorder, major

depressive disorder, PTSD, anxiety, and intermittent left abdominal pain as the conditions which

limited her ability to work. AR 214.[14] She traced her depressive disorder and anxiety to her arrest

and the subsequent legal proceedings. AR 214. Since these events, Plaintiff could no longer "have

a normal life" and, when reminded of her arrest, would "get very moody and [] not want to talk [to]

or see anybody." AR 214. She experienced recurring nightmares and flashbacks to the criminal

proceedings for a crime she believed she "was wrongfully accused of." AR 214. Plaintiff routinely

felt worthless, and had suicidal thoughts every day as well as difficulty maintaining focus and

concentration. AR 214. Anxiety and panic attacks were frequent as well. AR 220.[15] The SSA staff

member responsible for completing the disability report indicated that Plaintiff had crying spells

while being interviewed. AR 220. Plaintiff also suffered from abdominal pain on the left side as a

result of an ectopic pregnancy. AR 220.

With respect to activities of daily living, Plaintiff lost the energy to cook, clean, launder her

---

[14] The Court notes that, on the same page in the report, Plaintiff indicated that she "stopped working because of legal issues", but stated two lines later that she had stopped working "because of [her] condition." AR 214.

[15] A typical panic attack could be triggered when Plaintiff confronted a large group of people, took public transportation, or recalled her criminal case. AR 220. Each attack would last for "about 30 minutes" and produce "rapid heart beats, shortness of breath, cold sweats and light and leg weakness." AR 220.

clothes, or shop; her mother helped her with most of these tasks. AR 220. Also on the disability

report, Plaintiff explained her vocational history. AR 215.[16] Her longest held occupation was as a

bank teller, from 2001-2005. AR 215. In a typical day, Plaintiff stood for as many as seven and a

half hours, walked no more than four hours, and remained seated for no more than three hours. AR

216. She wrote or typed for seven and a half hours a day, and never lifted items weighing over 10

pounds. AR 216.

On May 10, 2010, Plaintiff completed a function report in which she stated that she lived in

an apartment with her family, and spent her days going to therapy, visiting her Pretrial Services

Officer, and attending medical appointments. AR 249. She also went shopping for food, and did

laundry and other chores around the house. AR 249. Plaintiff also prepared hot and cold meals on

a daily basis. AR 250. She left the house "almost everyday," either walking or traveling by public

transportation independently. AR 251. Although she had a driver's license, she did not drive since

her psychotropic medications were prone to make her drowsy. AR 251. Plaintiff's hobbies

included watching television and going to church twice a week. AR 252. Otherwise, she spent

time with her family, but had difficulty getting along with them because of her moodiness. AR 253.

Plaintiff described being "100 % changed" since the onset of her conditions, writing that she

had since lost her "social life, [] friends, [and was] not interest[ed] in going out at all." AR 253.

When she did leave her home, she was capable of walking for at least five blocks before stopping

for a rest. AR 254. Sleeping through the night also proved difficult. AR 255. Plaintiff indicated

---

[16] Elsewhere, the record contains a work history report. AR 222-43. Therein, Plaintiff listed seven separate jobs, which she held between 1997 and 2009, including insurance representative, teacher's assistant, bank teller, and administrative assistant. AR 222. Each of these positions involved limited heavy lifting. See AR 229, 233. As an insurance representative, Plaintiff sat for most of the day, while, as a teacher's assistant, she was frequently on her feet. AR 233.

that she was incapable of concentrating on television shows or finishing what she started, and that she had memory difficulties. AR 254. Although she could follow written instructions, she was unable to do the same with spoken direction. AR 254.

Plaintiff completed a second disability report in support of her appeal, in which she described a worsening in her anxiety-related symptoms and insomnia. AR 259. Plaintiff also experienced weight fluctuations (AR 259), and noted that both Klonopin and Lexapro made her dizzy and drowsy. AR 262. Plaintiff had lost interest in eating, showering, washing her clothes, and cleaning her room. AR 262. Instead, she stayed inside and avoided people. AR 262.

### d.    Plaintiff's Hearing Testimony

Plaintiff, accompanied by her attorney, testified at the administrative hearing held on October 28, 2011, by way of video teleconference from New York, New York. AR 11, 33.[17] Plaintiff lived with her mother and sister, and traveled to the hearing by train. AR 53. She had completed two years of college and, prior to her arrest, was contemplating returning to school to earn an associate's degree. AR 53. She explained that she had stopped working because she was arrested, and would have continued to work had she not been legally required by her employer to resign. AR 46-47. Following Plaintiff's arrest, but before she began serving her prison sentence, she described herself as "a social person, completely different" from who she had become by the time of the hearing. AR 49. For example, she had frequented church up to three times a day, and assisted children with classes, as well as with first communion and baptisms; she even got along "very well" with her family. AR 49. Plaintiff testified that in the months since her arrest she was "not the same person as before," and had become unable to return to work. AR 47.

---

[17] The ALJ presided over the hearing from San Juan, Puerto Rico. AR 11, 33.

While in prison, Plaintiff was responsible for cleaning the recreational area. AR 50. She described the job as "basically a 15 minutes thing" where she swept or mopped the area surrounding the weight-lifting equipment five days each week. AR 50-51. She had "no one telling [her] what to do or how to do it," and was able to sit down after 15 minutes. AR 50. Plaintiff enrolled in classes at the correctional facility, crochet and painting, but quickly lost interest. AR 51. She also became frustrated when taking these classes and could not follow her instructors' directions. AR 51.

Plaintiff testified that her symptoms improved during her incarceration, albeit briefly. AR 51. Her spirits were buoyed when she thought she would be released from prison earlier than expected; she soon "went back to the depression [,]" however, which grew worse toward the end of her sentence as, in Plaintiff's words, she was "coming home with nothing." AR 51-52.

Plaintiff explained that since leaving prison, she constantly cried, experienced decreased patience and concentration, and could no longer follow rules and orders nor tolerate noise or being near others who were talking. AR 47-48. She spent most days lying in bed. AR 48. In addition to suffering a decrease in energy, she lost interest in eating, cooking, reading, and helping children. AR 47-48, 53. With respect to interacting with others, Plaintiff had become "sort of [a] mean person," who was neither as social nor as communicative as she had once been. AR 48. Plaintiff lived with her mother and sister but did not get along with them. AR 48. During the hearing she repeatedly stated that she "just want[ed] to be by [herself]." AR 49-50. Plaintiff also described difficulty sleeping, necessitating the use of medication which made her feel "drunk" and fatigued. AR 50.

e.    **Dr. Jorge Hernandez Denton's Hearing Testimony**

Dr. Jorge Hernandez Denton, an internist with a specialty in gastroenterology, reviewed Plaintiff's records and testified as a medical expert as to Plaintiff's physical impairments at her

hearing. AR 37, 40-41. Dr. Hernandez Denton opined that Plaintiff's physical conditions neither

met nor equaled a listed impairment. AR 40. The expert noted Plaintiff's complaints of abdominal

pain in the lower lefthand quadrant, which appeared throughout the record and were attributed to

her surgery for an ectopic tubal pregnancy. AR 40. Dr. Hernandez Denton concluded that, while

Plaintiff experienced discomfort, she did not suffer from any functional limitations. AR 40.

### f.    Dr. Amarilis Serrano's Hearing Testimony

Dr. Amarilis Serrano, a clinical psychologist, also testified at Plaintiff's October 28, 2011,

hearing. AR 37, 41-46. He first opined that Plaintiff's mental conditions neither met nor equaled a

listing. AR 41. Although the record consistently referred to three relevant psychological diagnoses

- major depressive disorder, anxiety, and PTSD - Dr. Serrano observed that each finding was

"poorly described or explained" in reference to how, or whether, it affected Plaintiff's functioning.

AR 42, 43-44.[18]   Dr. Serrano found that the record amounted to little more than a list of Plaintiff's

symptoms, without any opinions reflecting the extent of her functional limitations. AR 43-44.[19]

Nevertheless, the psychological expert testified that Plaintiff suffered from mild to moderate

attention problems and would need to be limited to simple tasks at work. AR 43. He noted that

Plaintiff was prescribed mild medication and given a "mild to moderate" diagnosis from her

---

[18] As is discussed in the Court's analysis of the ALJ's decision below, Dr. Serrano testified without the benefit of Plaintiff's records from her St. Mark's Place treatment providers, Dr. Nuñez and Mr. Muntasser.

[19] Dr. Serrano explained that the record only "mention[s] that [Plaintiff] feels depressed, [and] that she feels anxious [,] but it does not provide information on how [these symptoms are] impacting her functioning, ... We just have a basic list of symptoms [.]" AR 44. He went on, "in my opinion I have no doubt that the claimant has a condition present. The problem is that [the record] fails to provide information to see if it is something that impacts her functioning or [if the condition is] just responding to a specific crisis with all the anxiety [] that she's going through." AR 45.

consultative examiner. AR 42. Pointing specifically to Plaintiff's treatment notes from the Bureau of Prisons, Dr. Serrano explained that the records simply lacked the "objective information to support [a listing]." AR 42-43.

### g.    Dr. Maria Puig's Hearing Testimony

Dr. Maria Puig, a psychologist and vocational expert, also testified at the hearing. AR 38, 53-61. She first noted that Plaintiff's employment history consisted of jobs with sedentary to light exertional demands, and mental demands which ranged from unskilled, semi-skilled, to skilled. AR 55.[20] Next, Dr. Puig answered questions about whether six hypothetical individuals with Plaintiff's vocational profile and certain restrictions could perform jobs in the national economy. AR 55-61.

Responding to the first hypothetical, Dr. Puig testified that an individual with Plaintiff's age, education and work experience, who could sit, stand, walk, lift, carry, push and pull without limitation, but was restricted to working on simple, routine, repetitive tasks in a work environment free from fast-paced production, involving only simple work-related decisions and few changes, with occasional interpersonal interaction, could not perform any of Plaintiff's prior jobs. AR 55-56. Nevertheless, Dr. Puig found, this hypothetical Plaintiff could engage in at least three other occupations existing in significant numbers in the national economy. AR 56. For instance, the individual could work as a general cleaner (unskilled mental demands, medium exertional demands), a job for which there were 51,000 positions in the Bronx, NY region, and 887,390 employees nationally; he or she could also work as a laundry worker (unskilled, light), which had

---

[20] Plaintiff's most recent job was as a teacher's assistant, categorized as a low, semi-skilled vocation with a light exertional level. AR 54. Prior to that, she worked as an administrative assistant (skilled, sedentary), order taker (unskilled, sedentary), bank teller (semi-skilled, light work), bookkeeper (skilled, sedentary), insurance representative (semi-skilled, sedentary), and cashier (unskilled, light). AR 54.

11,000 positions locally and 211,490 positions nationally; or, the hypothetical claimant could work as a packager (unskilled, light), with 6,800 local positions and 340,120 positions nationwide. AR 56.

The second putative claimant possessed the same profile described above, but with the added limitation that he or she would need to be isolated from working with others, and receive only occasional supervision. AR 56-57.[21] According to Dr. Puig, such a claimant would still be able to perform each of the above-noted occupations, since such jobs typically do not involve frequent supervision. AR 57.

The third hypothetical claimant had the additional limitations of being incapable of dealing with changes in a routine work setting, tolerating criticism or handling work-related stress. AR 57. As Dr. Puig noted, there is an expectation that an employee be capable of handling normal work related stresses. AR 57. The vocational expert, accordingly, responded that such a claimant would be unable to perform any of Plaintiff's prior occupations, as well as any of the jobs listed above. AR 57. Dr. Puig then testified, responding to a fourth hypothetical, that an individual matching the above description, who also needed to take up to four, unscheduled, fifteen-minute breaks per day, would be unable to perform any of the jobs described above. AR 58.

The ALJ then asked Dr. Puig to consider a fifth hypothetical claimant. AR 58. This individual had a severe mental condition which frequently disrupted his or her attention and concentration, rendering it difficult to be "attentive to [the] quality on [his or] her work production

_____

[21] Before answering this hypothetical, Dr. Puig clarified that, "from a vocational perspective occasional supervision means up to one-third of the day the person is in interaction with a supervisor [.]" AR 57. Later during the hearing, Dr. Puig, responding to a question from Plaintiff's counsel, testified that jobs with occasional supervision are those that are "not done in team work or [in] frequent interaction with coworker[s], [and] they are not support type[s] of work so the person may very well be able to do the tasks on their own." AR 59.

schedule." AR 58. Such a claimant, Dr. Puig opined, could not perform any of the aforementioned jobs. AR 58.

The sixth theoretical claimant possessed the added limitation that he or she could not respond appropriately to supervision, criticism, and the "usual work situation," nor accept criticism. AR 58. Dr. Puig testified that, "even the occupations that have occasional supervision would require the person to have the ability to accept criticism and respond to some sort of supervision." AR 59. Accordingly, there were no jobs existing in significant numbers in the national labor market which this sixth hypothetical claimant could perform. AR 59.

## C.    Evidence Submitted on Appeal to the SSA Appeals Council

Plaintiff requested review by the SSA Appeals Council on December 23, 2011. AR 7. In support of that appeal, she submitted additional medical records from FEGS, as well as documents from Dr. Nuñez and Mr. Muntasser, whom she had treating relationships with through St. Mark's Place. AR 5.

### 1.    FEGS WeCare

On October 26, 2011, Abraham Burstein, a social worker employed by FEGS, issued a report detailing Plaintiff's mental health history and current symptoms. AR 540.[22] Plaintiff reported a history of suicidal ideations since 2009, but denied ever attempting to act on these thoughts. AR 540. According to Mr. Burstein, Plaintiff heard voices telling her she was going crazy, and last experienced these hallucinations some three weeks earlier. AR 540. Five days prior to this evaluation, Plaintiff reportedly experienced visual hallucinations as well. AR 540. In addition, she displayed low self-esteem and described feeling depressed, tired, and unable to eat,

---

[22] Duplicate reports, essentially reproducing these same notes, were also generated and incorporated into the administrative record. AR 574-608.

sleep, or concentrate. AR 540-41, 544. Plaintiff scored an 18 on a PHQ-9 test, demonstrating severe depression. AR 541. Although she was physically able to complete all activities of daily living, she did not actually perform them, due to her depression. AR 542.

On October 27 and November 3, 2011, various members of the FEGS staff completed a medical report. AR 521-26. Plaintiff presented to the examiners "crying and very depressed." AR 526. Although Plaintiff's score on a psychiatric test was indicative of severe depression, her results on additional standard laboratory testing were normal. AR 521-22, 524. The FEGS staff diagnosed Plaintiff with major depressive disorder, anxiety, and gastritis, but considered Plaintiff to be in stable condition, noting that she was currently compliant with treatment, which included antidepressants and therapy. AR 522-23, 525. Dr. Robert Marc Romanoff concluded that Plaintiff suffered from concentration problems and was best suited to work in a low stress environment. AR 525. Sheryl Pringle, a FEGS Executive, opined that Plaintiff could participate in 30 hours of vocational rehabilitation or services. AR 526.

Maribel Feliz, also a FEGS employee, completed an Ongoing Comprehensive Service Plan ("CSP") form on December 19, 2011. AR 527-32. Ms. Feliz determined that Plaintiff was "unable to work for at least twelve months and should begin the SSI application process." AR 528. Plaintiff was then receiving mental health treatment on a weekly basis, and was taking Klonopin and Cymbalta. AR 528. She stated that she visited with Dr. Nuñez once each week and Mr. Muntasser, a social worker, every month. AR 531. Ms. Feliz also noted that Plaintiff was able to "run her errands, clean [her] house, etc." AR 528.

## 2.    Dr. Giovanny Nuñez

Dr. Nuñez prepared a one-page report on November 10, 2011, in which he diagnosed Plaintiff with major depressive disorder, recurrent with psychotic features. AR 571. Plaintiff

appeared with a depressed and anxious mood, sad affect, and experiencing auditory and visual hallucinations, but reported no suicidal or homicidal ideations. AR 571. Plaintiff was taking Cymbalta and Klonopin, and attending individual psychotherapy weekly and psychiatric treatment on a monthly basis. AR 571.

### 3. Niezar Muntasser, LCSW

By letter dated November 10, 2011, addressed to FEGS, Mr. Muntasser confirmed that Plaintiff was his patient at St. Mark's Place. AR 573. He reiterated his diagnosis of major depressive disorder, recurrent with psychotic features. AR 573. Mr. Muntasser wrote that as a result of this condition and the related symptoms, Plaintiff would be "unable to participate in work related activities for at least 12 months." AR 573. He also confirmed that Plaintiff took both Cymbalta and Klonopin, and attended psychotherapy on a weekly basis and psychiatric treatment once per month. AR 573.

## II. APPLICABLE LEGAL PRINCIPLES

### A. Standard of Review

The scope of review in an appeal from a social security disability determination involves two levels of inquiry. First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standards. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). Failure to apply the correct legal standard is grounds for reversal of the ruling. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Second, the court must decide whether the Commissioner's decision was supported by substantial evidence. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 106 (internal quotation marks and citations omitted). When determining whether substantial evidence supports the

Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides." Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted). As such, if the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

**B.    Determining Disability**

The Act defines the term 'disability' as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  One is disabled under the relevant statute if he or she suffers from an impairment which is "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot ... engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C.  § 423(d)(2)(A).  "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

Regulations issued pursuant to the Act set forth a five-step process to aid the Commissioner in determining whether a particular claimant is disabled.  The Commissioner first considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),(b), 416.920(a)(4)(i), (b).  If the claimant is so engaged, then the Commissioner will find that the claimant is not disabled;  if the opposite is true, then the Commissioner proceeds

to the second step. 20 C.F.R. §§ 404.1520(a)(4)(i),(b), 416.920(a)(4)(i), (b). At step two, the Commissioner determines the medical severity of the claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant suffers from any severe impairment, the Commissioner, now at step three, must decide if the impairment meets or equals a listed impairment; listed impairments are presumed severe enough to render one disabled, and the criteria for each listing is found in Appendix 1 to Part 404, Subpart P of the Social Security Regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii),(d), 416.920(a)(4)(iii),(d).

If the claimant's impairments do not satisfy the criteria of a listing at step three, the Commissioner must then determine the claimant's residual functional capacity ("RFC"), taking into consideration all of the relevant evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's residual functional capacity represents "the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). At the fourth step, the Commissioner determines whether the claimant can perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv),(e)-(f), 416.920(a)(4)(iv),(e)-(f). If the claimant cannot perform his or her past relevant work, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether he or she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v),(g), 416.920(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citations omitted). If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining

steps. Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000). If the fifth step is necessary, the burden

shifts to the Commissioner to show that the claimant is capable of other work. DeChirico, 134 F.3d

at 1180 (citation omitted).

## III.   DISCUSSION

Plaintiff's instant lawsuit challenges the ALJ's unfavorable decision, which found that

Plaintiff was not disabled under the Act. She asks this Court to reverse that decision and award

benefits, or, alternatively, to remand the case to the Agency for further proceedings. ECF No. 2,

at 3. Plaintiff presses four arguments in support of such relief. She contends that: (1) the ALJ

failed to develop the record (ECF No. 27, 9-13); (2) the ALJ erroneously weighed the medical

opinions (ECF No. 27, at 11-12); (3) the ALJ's credibility analysis was legally flawed; and (4)

evidence submitted to the Appeals Council after the ALJ's decision "should have been considered

by the ALJ for a fair analysis" of Plaintiff's claim. ECF No. 27, at 14.   For the reasons that

follow, the Court recommends that the Agency's decision be vacated and the case be remanded for

further proceedings consistent with this opinion.[23]

### A.    The ALJ's Decision

After confirming that Plaintiff met the insured status requirements of the Act, the ALJ

applied the five-step analysis set forth above. AR 13. First, he determined that Plaintiff had not

_____

[23] In addition to these arguments, the Commissioner raises a number of contentions which
Plaintiff does not respond to in either her initial papers in support of her cross-motion for
judgment on the pleadings or her reply. For instance, the Commissioner argues that the ALJ
appropriately found that Plaintiff had no severe impairments, and reasonably relied on the
vocational expert's testimony. ECF No. 25, at 20-21, 23. The Court does not reach these
questions in the report and recommendation at bar, however; they are not disputed by the parties,
and, importantly, cannot be properly evaluated until the record is fully developed. See, e.g.,
Jeanniton v. Berryhill, No. 15-Civ-5145 (DLI), 2017 WL 1214480, at *12 (E.D.N.Y. Mar. 31,
2017) (citing cases from the S.D.N.Y. and Second Circuit) (refusing to address similar, albeit
disputed, arguments in light of the ALJ's failure to develop the record).

engaged in substantial gainful activity since April 5, 2009, the alleged onset date. AR 13. At the second step, the ALJ found that Plaintiff suffered from two severe impairments: a depressive disorder and an anxiety disorder. AR 13. At the third step, however, the ALJ determined that Plaintiff's impairments, considered both individually and in combination, neither met nor medically equaled the severity of listings 12.04,[24] for affective disorders, or 12.06,[25] for anxiety-related disorders. AR 14-15.[26] The ALJ then proceeded to determine Plaintiff's RFC. AR 15-23.

---

[24] A claimant meets listing 12.04 in one of two ways. He or she may either satisfy the requirements of paragraphs A and B, or fulfill the requirements of paragraph C. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.04. Paragraph A demands the medically documented persistence of at least four depressive symptoms, including, but not limited to, sleep disturbance, appetite disturbance with change in weight, pervasive loss of interest in almost all activities, decreased energy, or feelings of guilt or worthlessness. Id. Paragraph B requires at least two of the following limitations: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, attention, or pace; or (4) repeated episodes of decompensation, each of extended duration. Id. Paragraph C is met when there is a medically documented history of a chronic affective disorder lasting at least two years which has "caused a more than minimal limitation in the ability to perform basic work activities", coupled with one of the following: (1) repeated episodes of decopensation, each of extended duration; or (2) a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or (3) one or more years of "an inability to function outside a highly supportive living arrangement." Id.

[25] There are also two ways in which a claimant meets listing 12.06. The individual may either satisfy the requirements in both paragraphs A and B, or fulfill the criteria in both paragraphs A and C. Paragraph A requires medically documented findings of generalized persistent anxiety accompanied by three of the four symptoms: (1) motor tension; or (2) autonomic hyperactivity; or (3) apprehensive expectation; or (4) vigilance and scanning. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.06. "The Listing 12.06 paragraph B criteria are the same as the paragraph B criteria under listing 12.04." Gomez v. Comm'r of Soc. Sec., No. 14-Civ-7207 (PAE) (FM), 2016 WL 3938161, at *11 (S.D.N.Y. July 18, 2016) (adopting report and recommendation) (citing 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.06(B)). Paragraph C requires that the claimant demonstrate a "complete inability to function independently outside the area of one's home." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.06(C).

[26] The ALJ first determined that Plaintiff failed to demonstrate the presence of marked restrictions in at least two of the paragraph B requirements, which are applicable to either listing. Here, the ALJ adopted the opinion of Dr. Kamin, a consultative psychologist who examined

The ALJ found that Plaintiff had the RFC to perform the full range of work at all exertional levels, and could understand, remember and carry out simple, routine and repetitive tasks, but had two non-exertional limitations; Plaintiff (1) must work in an environment free of fast-past production requirements, involving only simple work-related decisions, with few, if any, workplace changes, and (2) was limited to only occasional interaction with co-workers and the public. AR 15.

In determining Plaintiff's RFC, the ALJ employed the multi-step framework laid out in the regulations. He first outlined Plaintiff's symptoms and identified which medically determinable impairments could reasonably be expected to produce them. AR 16; see 20 CFR §§ 404.1529, 416.929.[27] Next, the ALJ evaluated the credibility of Plaintiff's statements as to the limiting effects

---

Plaintiff's records and determined that Plaintiff only suffered mild limitations in activities of daily living; moderate restrictions in social functioning; and moderate limitations in maintaining concentration, persistence, or pace. AR 14-15. The ALJ also noted that no mental health provider or physician in the record reported that Plaintiff met the severity requirements of either listing. AR 14. Indeed, he wrote, Drs. Serrano and Hernandez Denton, the medical experts that testified at the hearing, both opined that Plaintiff's conditions failed to satisfy a listing. AR 14.

With respect to the paragraph C criteria, the ALJ also determined that Plaintiff failed to meet the requirements of either listing. AR 15. As to listing 12.04(C), the ALJ found that there was "no evidence of a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands aswould be predicted to cause the claimant to decompensate; or an inability to function outside a highly supportive living arrangement, with indication of continued need fosuch arrangement." AR 15. With respect to 12.06(C), the ALJ found no evidence that Plaintiff was "completely unable to function outside of her home environment." AR 15. The ALJ relied on Plaintiff's statements to FEGS evaluators that she traveled independently by public transportation and interacted with family members. AR 15. He also gave credence to Dr. Bougakov's findings, that Plaintiff could perform household chores independently, manage money and take public transportation; that she occasionally socialized with friends and maintained a good relationship with her family, and went to church. AR 15. The ALJ also considered Dr. Revan's notes, which found that Plaintiff was able to perform various activities of daily living, including shopping, and that she attended her various appointments. AR 15.

[27] The ALJ reported that Plaintiff's claimed symptoms included disrupted sleep, appetite disturbance, crying spells, feelings of worthlessness, suicidal thoughts, problems with attention and concentration, lack of energy or motivation, and a tendency towards social isolation. AR 16. The ALJ then concluded that Plaintiff's impairments, such as mood disorder, major depressive disorder, PTSD, acute stress disorder, and anxiety, could reasonably be expected to cause at least

of her impairments. AR 16-21; see 20 CFR §§ 404.1529, 416.929.[28] In considering the opinion

evidence in the record, the ALJ then explained the deference he assigned to the various medical

sources. AR 21-23; see 20 CFR §§ 404.1527, 416.927. He gave significant weight to Dr.

Bougakov; great weight to Drs. Serrano, Fortuño-Ramirez, and Hernandez Denton; some weight

to Plaintiff's treating sources at FEGS and St. Mark's Place; and less weight to Dr. Revan. AR 21-

22.[29] The ALJ also considered, and attributed some weight to, Dr. E. Kamin, an SSA psychological

consultant whose findings were determined to be consistent with the record as a whole. AR 23.

At the fourth step, relying on the testimony of the vocational expert, the ALJ determined

---

some of these symptoms. AR 16.

[28] Ultimately, the ALJ found that Plaintiff's statements regarding the limiting effects of
symptoms were not credible "to the extent that they [were] inconsistent with medical and other
evidence of the record." AR 16. In making this finding, the ALJ considered oral and written
testimony from the impartial medical experts, reports of consultative examiners, and records
submitted by Plaintiff's treating mental health providers at the Bureau of Prisons, FEGS, and St.
Mark's Place. AR 16-20. The ALJ also reviewed hospital records from New York Presbyterian
and Montefiore Medical Center. AR 18. The ALJ additionally considered Plaintiff's own reports
as to her capacity to engage in various activities of daily living, as well as her testimony at the
hearing. AR 19-21.

[29] The ALJ explained that he assigned significant weight to Dr. Bougakov because Dr.
Bougakov "had the opportunity to evaluate [Plaintiff] personally and his conclusions [were]
consistent with the record as a whole." AR 22. Likewise, the ALJ gave great weight to Drs.
Serrano, Fortuño-Ramirez, and Hernandez Denton because their opinions were consistent with
one another and with findings expressed elsewhere in the record, and supported by substantial
evidence. AR 21. Two of these three experts, moreover, were specialists in the mental health
field. AR 21. The ALJ only assigned some weight to Plaintiff's treating sources, such as Drs.
Villar of FEGS and Nuñez of St. Mark's Place, because they failed to provide treatment notes
establishing a "detailed, longitudinal perspective of [Plaintiff]'s impairments." AR 22. The ALJ
found records from the Bureau of Prisons were deserving of less deference because, like the
opinions of the other treating sources, they were sporadic and limited in terms of detail. AR 22.
The ALJ assigned less weight to Dr. Revan because her opinions were not substantiated by the
evidence in the record. AR 22. For instance, there were no objective clinical findings, tests, or
studies which supported the presence of an ongoing physical ailment, and Dr. Revan's own physical
examination was essentially normal and "absent of significant clinical findings." AR 22.

that Plaintiff could not perform her past relevant work. AR 23. He then continued to the fifth step, considering Plaintiff's age (30 years old as of the onset date), education (at least high school), work experience, and RFC in order to determine whether a successful adjustment to other work could be made. AR 23-24. Here, again, the ALJ relied upon the vocational expert's testimony, finding that Plaintiff could work as a general cleaner, laundry worker, or packager. AR 24. Accordingly, the ALJ concluded that Plaintiff was not disabled from the onset date, April 5, 2009, through the date of the decision, November 25, 2011. AR 24.

   **B.    Duty to Develop the Record**

   Plaintiff argues that the ALJ failed to fulfill his duty to develop the record by neglecting to obtain records from Plaintiff's treating psychiatrist, Dr. Nuñez, and therapist, Mr. Muntasser. ECF No. 27, at 9-13. Whether the ALJ has fulfilled his or her duty to develop the record is a threshold issue. See, e.g., Jackson v. Colvin, No. 13-Civ-5655 (AJN) (SN), 2014 WL 4695080, at *18 (S.D.N.Y. Sept. 3, 2014). The duty "arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination[,]" and exists irrespective of whether a claimant is represented by counsel. Pratts v. Chater, 94 F. 3d 34, 37 (2d Cir. 1996). It requires that the ALJ develop a "complete medical history for at least the 12 months preceding the month in which [the claimant] file[d] [his or her] application." 20 C.F.R. §§ 404.1512(d), 416.912(b); see also Lamay v. Comm'r of Soc. Sec., 562 F. 3d 503, 508-09 (2d Cir. 2009). In attempting to secure a fully developed record, the ALJ must "make every reasonable effort to help [a claimant] get medical reports from [his or her] own medical sources." 20 C.F.R. §§ 404.1512(d), 416.912(b).

   Courts in the Southern District of New York have recognized that the ALJ's obligation to develop the record is "particularly important where an applicant alleges he [or she] is suffering

from a mental illness." Hidalgo v. Colvin, No. 12-Civ-9009 (LTS) (SN), 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014); see also Gabrielsen v. Colvin, No. 12-Civ-5694 (KMK) (PED), 2015 WL 459548, at *4-5 (S.D.N.Y. July 30, 2015) (collecting cases in order adopting report and recommendation). Nevertheless, the ALJ's ultimate responsibility remains the same regardless of the type of impairments alleged; "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F. 3d 72, 79 n. 5 (2d Cir. 1999) (quoting Perez v. Chater, 77 F. 3d 41, 48 (2d Cir. 1996)); see also Gabrielsen, 2015 WL 4597548, at *4 (explaining that, despite the heightened duty in cases alleging mental impairments, the ALJ's end goal of developing a complete medical history free of gaps is the same in all cases).

In this case, the ALJ was confronted with an incomplete record with obvious gaps. His failure to obtain, let alone seek, notes or opinions from Plaintiff's treating psychotherapists to bridge those gaps necessitates remand. As the ALJ acknowledged, "absent from the record [were] any treatment progress notes [from Dr. Nuñez and Mr. Muntasser] that could provide a detailed, longitudinal picture of the nature and severity of [Plaintiff]'s mental impairments." AR 17. Before deciding Plaintiff's claim on the merits, then, he had the affirmative - indeed, a heightened - duty to "make every reasonable effort" to help her obtain these missing records. 20 C.F.R. §§ 404.1512(d), 416.912(b); see also Gabrielsen, 2015 WL 4597548, at *4 (explaining heightened duty).

The ALJ's failure to seek evidence from Dr. Nuñez and Mr. Muntasser is particularly problematic as they were the sources with whom Plaintiff had the most frequent and longstanding

32

treating relationships. Both Dr. Nuñez and Mr. Muntasser were repeatedly identified as Plaintiff's

treating sources throughout the record.[30] They treated Plaintiff from July 16, 2009, through

December 3, 2010, and then again following Plaintiff's release from prison in October, 2011. AR

517, 520. Despite these facts, all that appeared in the administrative file from either source at the

time of the decision were two letters, one from each professional. Each letter confirmed the nature

of the source's relationship with Plaintiff, the medications and treatments prescribed, and gave

cursory opinions that Plaintiff suffered from disabling psychiatric symptoms. AR 28-29, 515, 517.

Without the benefit of treatment notes or formal opinions from either source, the ALJ simply could

not have possessed a "complete medical history" detailing the nature and severity of Plaintiff's

alleged impairments. See Clark v. Comm'r of Soc. Sec., No. 15-Civ-8406 (PKC) (SN), 2017 WL

1162204, at *3-4 (S.D.N.Y. Mar. 27, 2017) (complete medical record necessarily includes

treatment notes from mental health professionals with the most frequent and sustained contact with

a claimant).

As stated above, the ALJ was aware that the record was incomplete.[31] Yet, rather than seek

---

[30] In a disability report accompanying Plaintiff's claim for benefits, which was part of the administrative record as of the hearing date, Plaintiff named Dr. Nuñez as the first treatment provider listed on the form, while including his phone number and address. AR 217. On a report filed with the Agency, dated November 30, 2009, Plaintiff again listed Dr. Nuñez as her primary psychiatrist, providing the same contact information. AR 357. In notes dated September 25, 2009, Plaintiff told Dr. Nivens of FEGS that she met with her psychiatrist monthly and a therapist weekly. AR 313. Dr. Bougakov, who saw Plaintiff in May, 2010, noted that Plaintiff met with her psychiatrist, Dr. Nuñez, on a monthly basis and her therapist, Muntasser, twice each week. AR 421.

[31] The ALJ was not alone in noting this gaping infirmity in the administrative file. Dr. Hernandez Denton found it "hard to say [whether Plaintiff had a disabling physical condition] because of the lack of information" in the record. AR 41. Dr. Amarilis Serrano, the psychiatric expert, testified that the record lacked treatment notes from Plaintiff's psychotherapists at St. Mark's Place. AR 43. The record, therefore, lacked a degree of completeness which made it not only impossible for the ALJ to render an accurate decision, but for experts whose opinions he

the missing records or obtain opinions from the treating sources, he relied on the absence of supporting documentation as a key justification for assigning these sources less weight. AR 22.[32] As a matter of law, the ALJ could not simply deny Plaintiff's disability claims on the grounds offered without first attempting to fill the obvious gaps in the record. Ulloa v. Colvin, No. 13-Civ-4518 (ER) (HBP), 2015 WL 110079, at *12 (S.D.N.Y. Jan. 7, 2015) (adopting report and recommendation); see also, e.g., Moran v. Astrue, 569 F. 3d 108, 114-15 (2d Cir. 2009) ("We vacate [and remand] not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision."); see also Rosado v. Barnhart, 290 F. Supp. 2d 431, 440 (S.D.N.Y. 2003) ("The ALJ cannot rely on the absence of evidence, and is thus under an affirmative duty to fill any gaps in the record.") (emphasis in original).

The Commissioner, in response, argues that the ALJ was not under an obligation to seek additional records from St. Mark's Place for two reasons. ECF No. 29, at 2. First, she contends, Plaintiff's counsel failed to raise the issue of missing records to the ALJ at the hearing or post-hearing appeal levels, and she did not - either by herself or through counsel - request assistance from the ALJ in obtaining the missing documentation during the proceeding. ECF No. 29, at 2 n. 2

---

relied upon to do the same.

[32] To be sure, the fact that Mr. Muntasser was a social worker, and therefore not considered an "acceptable medical source" under the Act, was also a factor relied upon by the ALJ in discounting Muntasser's opinions. AR 20 (citing to 20 C.F.R.§§ 404.1502, 404.1513, 404.1527, and SSR 06-03P, 2006 WL 2329939 (SSA Aug. 9, 2006)). Still, regardless of the weight the ALJ ultimately chose to assign to Plaintiff's therapist, he had to make that decision based upon a complete record. Moreover, as described in an Agency policy in effect at the time of - and which the ALJ cited to in - the decision, opinions from "licensed social workers ... are important and should be evaluated on key issues such as impairment severity and functional effects [.]" SSR 06-03P, 2006 WL 2329939, at *3 (SSA Aug. 9, 2006).

(citing AR 30-61, 272-74). The Commissioner's argument in this regard conflates a claimant's responsibility to furnish evidence with the ALJ's obligation to secure a fully developed record, even though these two duties are distinct. While it is true that the claimant maintains the burden of providing "all evidence known to [him or her] that relates to whether or not [he or she is] ... disabled," 20 C.F.R. §§ 404.1512(a), 416.912(c), the claimant's "responsibility to provide evidence regarding [his or] her disability does not diminish the ALJ's duty to develop gaps in the record [.]" Estrella v. Comm'r of Soc. Sec., No. 12-Civ-6134 (NSR) (JCM), 2016 WL 5920128, at *3-4 (S.D.N.Y. Oct. 7, 2016) (order adopting report and recommendation); see also 20 C.F.R. §§ 404.1512(a), 416.912(c) (expressly referring to the responsibilities of the Agency and claimant as separate but co-existing demands). As such, regardless of the efforts counsel did or did not make in order to obtain the missing evidence, the ALJ still had an affirmative duty to develop the record fully.

The Commissioner's second argument is also unavailing. Pursuant to regulations effective when Plaintiff's claim was decided, an ALJ need not re-contact a treating source when he or she knows from prior experience that such a demand would be futile. See 20 C.F.R. 404.1512(e)(2). Citing to this regulation, the Commissioner argues that any attempt to contact Dr. Nuñez would have proved fruitless, and was therefore not required, since on June 10, 2010, Plaintiff told an SSA employee that her St. Mark's Place treatment providers would not submit records to the Agency, as they concerned her probation. ECF No. 29, at 2; AR 257. This conclusion does not follow from the premise. There is no evidence that the ALJ or SSA attempted to contact Plaintiff's treating sources at St. Mark's Place, successful or not. There is therefore no indication that they had reason to believe further attempts would be futile. Just as a reviewing court "may not accept appellate

counsel's <u>post hoc</u> rationalizations for agency action", it should not accept similar ex post

justifications to explain agency inaction. <u>Snell v. Apfel</u>, 177 F. 3d 128, 134 (2d Cir. 1999)

(quotation omitted). But for the arguments raised in the Commissioner's brief, there is no mention

in the ALJ's decision that Plaintiff's statement in June, 2010, was the reason for the missing

records, or for the ALJ not attempting to contact St. Mark's Place to retrieve them. Accordingly,

the ALJ was not excused from seeking the missing records from Dr. Nuñez and Mr. Muntasser.

**C.      Plaintiff's RFC**

The parties also dispute the ALJ's RFC finding. Although Commissioner argues that, in

rendering an RFC determination, the ALJ properly weighed the opinions and found Plaintiff not

fully credible (ECF Nos. 25, at 18-23; 29, at 2), Plaintiff contends that both the ALJ's evaluation of

source opinions and his credibility determination were erroneous. ECF Nos. 27, at 11-12, 15-16;

30, at 3. Each of these contentions are addressed in turn.

**1.      Evaluation of Opinion Evidence**

SSA regulations require an ALJ to consider "every medical opinion" in the record,

"[r]egardless of its source." 20 C.F.R. §§ 404.1527(c), 416.927(c). However, not all sources of

opinion are entitled to the same deference. For instance, a treating psychiatrist's opinions may be

given controlling weight when they are well-supported by medically acceptable clinical and

laboratory diagnostic techniques, and are consistent with the other substantial evidence in the

record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). With respect to the opinions of non-treating

sources, and those of a treating source who is not given controlling weight, the regulations require

the ALJ to consider relevant factors when determining the appropriate amount of deference to

assign. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).[33]

### a. Dr. Nuñez

The Commissioner argues that the ALJ appropriately assigned "some weight" to the

findings of Dr. Nuñez. ECF No. 25, at 20-21. As Plaintiff's treating psychiatrist, Dr. Nuñez's

opinion was entitled to controlling weight, unless the ALJ cited to "good reasons" for discounting

it. See Snell, 177 F. 3d at 133. Here, the ALJ provided only one reason for assigning Plaintiff's

treating psychiatrist less than controlling weight: he pointed to the lack of treatment notes

establishing "a detailed, longitudinal perspective of [Plaintiff]'s impairments." AR 22. However,

the absence of notes or opinions from a treating psychiatrist does not appear as a relevant factor that

the ALJ should consider when determining the weight to assign to a medical source's opinion. See

20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6); see also Halloran v. Barnhart, 362 F. 2d 28, at

32 (2d Cir. 2004) (listing factors). To the contrary, it indicates, as discussed above, that the ALJ

failed to fulfill his threshold responsibility to develop the record.

Without a fully developed record, the ALJ could not, as a matter of law, have properly

applied the treating physician (or psychiatrist) rule. See Pabon v. Barnhart, 273 F. Supp. 2d 506,

514 (S.D.N.Y. 2003) (until the ALJ develops the record, he or she "cannot even begin to discharge

his [or her] duties ... under the treating physician rule." (quoting Peed v. Sullivan, 778 F. Supp.

1241, 1246 (E.D.N.Y. 1991) (alteration in original)); see also Hidalgo, 2014 WL 2884018, at *19-

20 (adopting report and recommendation finding that ALJ committed legal error relying on gaps in

---

[33] These factors include: (1) the length and nature of the treating relationship; (2) the degree to which an opinion is supported by medical and/or laboratory findings; (3) the consistency of the opinion with the record as a whole; (4) whether the treating source specializes in an area relevant to the claimed impairments; and (5) any other relevant factors which may be brought to the Agency's attention. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

the record to discredit treating psychiatrist's opinion).[34] Accordingly, on remand and upon fully developing the record, the ALJ should re-evaluate Dr. Nuñez's findings in accordance with 20 C.F.R. §§ 404.1527, 416.927.

### b. Drs. Serrano and Fortuño-Ramriez

Plaintiff argues that the ALJ impermissibly assigned great weight to the opinions of psychiatric experts Drs. Serrano and Fortuño-Ramirez. ECF No. 27, at 11-12. As a general proposition, the opinion of a medical expert may override the findings of a treating source. See, e.g., Halloran, 362 F. 3d at 32 (ALJ need not give controlling weight to treating physician's opinions when they are inconsistent with other substantial evidence in the record, including the opinions of other medical experts); Abdur-Razzaq v. Colvin, No.12-Civ-7350 (LTS) (FM), 2014 WL 1041786, at *18 (S.D.N.Y. Mar. 18, 2014) (opinions of non-examining medical experts in tandem with testimony from claimant constituted substantial evidence supplanting the treating source's opinions). The ALJ may even give great weight to a non-examining expert "as long as [his or her] opinions are supported by substantial evidence." Arzuaga v. Colvin, No. 13-Civ-6847 (AKH), 2014 WL 7180438, at *6 (S.D.N.Y. Dec. 11, 2014) (citations omitted). Nevertheless, the opinion of an expert rendered without the benefit of a complete record cannot constitute substantial evidence. Pratts, 94 F. 3d at 38.

Here, the ALJ's failure to develop the record necessarily impacted the conclusions

---

[34] Without the benefit of notes from his seventeen-plus month treating relationship with Plaintiff, the only opinion from Dr. Nuñez which appeared in the record when the ALJ rendered his decision was a letter, dated September 30, 2010, diagnosing Plaintiff with depressive disorder and PTSD, and stating that Plaintiff would be "unable to participate in work related activities for at least 12 months." AR 515. Since this opinion essentially amounts to a statement that Plaintiff was disabled, the ALJ was entitled to disregard it in its entirety. See Snell, 177 F. 3d at 133 (citing to the regulations, describing that the "ultimate finding of whether a claimant is disabled and cannot work" is a matter "reserved to the Commissioner.").

rendered by Drs. Serrano and Fortuño-Ramirez. Both Dr. Serrano, who testified at the hearing, and Dr. Fortuño-Ramirez, who provided written interrogatory responses, based their decisions on an incomplete record. Indeed, Dr. Serrano testified that the record insufficiently explained the degree to which Plaintiff was functionally limited, if at all, due to her alleged mental impairments. AR 43-44. Likewise, Dr. Fortuño-Ramirez offered his written findings without Plaintiff's treatment notes from the Bureau of Prisons or St. Mark's Place. AR 448-56. See Pratts, 94 F.3d at 38 (remanding where "sole evidence before the ALJ refuting [the plaintiff]'s claims ... was an incomplete medical history and an expert opinion rendered from it. Such a record offers us no basis to find the substantial evidence necessary to uphold the ALJ's decision.").

Even if Drs. Serrano and Fortuño-Ramirez had based their findings on a complete record, the ALJ's justifications for assigning their opinions "great weight" were insufficient. Rather than providing a detailed analysis employing the factors listed in the regulations, 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6), the ALJ generically referred to the record as a whole, simply stating their opinions were "supported by substantial and credible evidence." AR 21. He also relied on the fact that Drs. Serrano and Fortuño-Ramirez were "specialists in the mental health field." AR 21. The ALJ's cursory reasoning is telling. Had he issued a detailed explanation as to how these experts' opinions conflicted with those of treating psychotherapists, he would have been forced to confront the fact that the record was incomplete. Accordingly, on remand, the ALJ should re-evaluate the medical experts' findings after fully developing the record. Indeed, the Agency may well find it necessary to supplement the record with new expert testimony once notes and opinions from Plaintiff's treatment providers at St. Mark's Place are obtained.

### c. **Bureau of Prisons Psychiatrists**

Plaintiff also argues that the ALJ was under an obligation to seek an opinion from "the

prison psychiatrist" regarding the extent of Plaintiff's limitations. ECF Nos. 27, at 12. The regulations provide that treating sources may submit medical source statements, which are "[m]edical reports [including] ... [a] statement about what [the claimant] can still do despite [his or her] impairment(s)." 20 C.F.R. §§ 404.1513, 416.913.[35] The ALJ's failure to seek such an opinion from a given treating source does not automatically call for remand, as long as "the record contains sufficient evidence from which an ALJ can [otherwise] assess the petitioner's residual functional capacity." Tankisi v. Comm'r of Soc. Sec., 521 Fed. App'x 29, 34 (2d Cir. 2013) (summary order) (internal citations omitted).

Whether an evidentiary record, which lacks a given medical source opinion, is otherwise complete remains a fact-specific inquiry; "at core, [it asks] whether an ALJ could reach an informed decision based on the record [.]" Sanchez v. Colvin, No. 13-Civ-6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015). An important consideration is "whether the treating [psychiatrist] assessed the claimant's limitations." Laing v. Comm'r of Soc. Sec., No. 15-Civ-7764 (HBP), 2017 WL 934715, at *15 (S.D.N.Y. Mar. 9, 2017). To paraphrase another court within this Circuit, the issue becomes whether the treating source's views as to a claimant's RFC can be divined from their notes, so that all which is missing from the record is a formal statement of opinion. DeLeon v. Colvin, No. 15-Civ-1106 (JCH), 2016 WL 3211419, at *4 (D. Conn. June 9, 2016) (citing Tankisi, 521 Fed. App'x at 34; Whipple v. Astrue, 479 Fed. App'x 367, 370 (2d Cir. 2012).

---

[35] The regulations applicable to this case define the term "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502, 416.902.

Here, the record was not so comprehensive as to allow for the ALJ to render an informed decision without any treating source opinions from the Bureau of Prisons. During her incarceration, Plaintiff received medical or mental health treatment on at least ten separate occasions over several months. AR 474-506. In that time, she met with at least five different treatment providers, including three visits each with Dr. Karen Brody (AR 474-74, 478-79, and 495-97) and APRN Rosemary Johnson (AR 408-82, 484-85, and 488-90), and two meetings with Dr. Tiffany Sanders. AR 476-77, 499-500. Although the record contains notes from each of these visits, the notes do not set forth the treating professional's views as to Plaintiff's functional limitations, or lack thereof. Instead, the various notes from the Bureau of Prisons report general findings as to Plaintiff's mood, her appearance, or her level of physical discomfort on a given day. The Court, however, cannot infer from these notes whether any functional limitations were perceived by the given treating sources who wrote them. As medical professionals who had ongoing treatment relationships with Plaintiff, Drs. Brody and Sanders, and APRN Johnson, are the types of sources who could offer informative opinions as to the extent to which Plaintiff's mental impairments affected, or would be expected to affect, her functioning. Upon remand, therefore, the Agency should attempt to secure medical source statements from these treating providers.[36]

---

[36] The parties also dispute the need for a formal medical source statement ("MSS"), or functional assessment, from Dr. Nuñez. ECF Nos. 29, at 3; 30, at 3-4. As discussed, the failure to obtain a formal MSS from a treating source is not "reflexively fatal" so long as the record would otherwise "contain[] sufficient evidence from which an ALJ can assess the petitioner's [RFC]." Jeanniton, 2017 WL 1214480, at *9 (quoting Tankisi v. Comm'r of Soc. Sec., 521 Fed. App'x 29, 34 (2d Cir. 2013) (summary order)). Here, as described above, the record is inadequate to allow for a meaningful assessment of Plaintiff's RFC. Whether, with the benefit of the missing treatment records - those from Plaintiff's two primary psychotherapists spanning more than 17 months - the record would still be incomplete remains an open question. Accordingly, in further

## 2.   **Credibility Determination**

While the Commissioner contends that the ALJ permissibly found Plaintiff not fully credible, Plaintiff responds that the ALJ could not have rendered a valid credibility assessment based on an incomplete record. ECF Nos. 25, at 21-23; 27, at 15-16. In determining whether a claimant is disabled, the ALJ necessarily takes the claimant's subjective reports of pain and other limitations into account. Genier v. Astrue, 606 F. 3d 46, 49 (2d Cir. 2010). To aid in evaluating a claimant's credibility, the regulations set out a two-step process. First, the ALJ determines whether a claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [his or her] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b). If so, the ALJ considers "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. 20 C.F.R. §§ 404.1529(a), 416.929(a).

In assessing a claimant's credibility, an ALJ must consider all available evidence, while providing "specific reasons for the weight accorded to the claimant's testimony." Alcantara v. Astrue, 667 F. Supp. 2d 262, 277-78 (S.D.N.Y. 2009). In addition, the regulations direct the ALJ to consider information regarding (i) the claimant's daily activities; (ii) the location, frequency, duration, and intensity of his or her symptoms; (iii) any precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medications taken; (v) treatment other than medication which used to relieve the claimant's symptoms; (vi) any measures used to relieve his or her symptoms; and (vii) other factors concerning functional

---

developing the record, the Agency should, at the very least, obtain Plaintiff's records from St. Mark's Place, and ideally, seek to secure an MSS from Dr. Nuñez or Mr. Muntasser as well.

limitations and restriction resulting from the claimed symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c).

Here, although ALJ applied the proper legal standards in evaluating Plaintiff's credibility, he did not possess a complete medical history to support his findings. Without a fully developed record, moreover, the Court cannot conclude whether substantial evidence supported the ALJ's credibility finding. Merriman v. Comm'r of Soc. Sec., No. 14-Civ-3510 (PGG) (HBP), 2015 WL 5472934, at *23 (S.D.N.Y. Sept. 17, 2015) (order adopting report and recommendation). Accordingly, upon securing a complete record, the ALJ should also reassess Plaintiff's credibility. See Rosa, 168 F. 3d at 82 n. 7 (refusing to accept ALJ's conclusion as to the plaintiff's credibility given failure to develop the record); see also Garretto v. Colvin, No. 15-Civ-8734 (HBP), 2017 WL 1131906, at *22 (S.D.N.Y. Mar. 27, 2017) (concluding ALJ should re-evaluate the plaintiff's testimony after "taking steps to develop the record as directed."); Montilla v. Comm'r of Soc. Sec., No. 13-Civ-7012 (LTS) (MHD), 2015 WL 4460958, at *22 (S.D.N.Y. July 21, 2015) (although the ALJ "supported his credibility findings with sufficient detail and attention to the factors specified in the regulations and caselaw, it [was] nonetheless unacceptable because it [was] based on a record that [had] not been properly and fully developed.").

### D.    Consideration of New Evidence

Plaintiff argues that new evidence submitted to the Appeals Council after the ALJ's decision "should have been considered by the ALJ for a fair analysis of [her] claim." ECF No. 27, at 14. As the Commissioner quite clearly points out, however, it would have been impossible for the ALJ to consider evidence that was not before him at the time he issued his decision. ECF No. 29, at 3. It appears, moreover, that the Appeals Council considered the supplemental evidence

when it denied Plaintiff's request for review, finding that any newly submitted records did not "provide a basis for changing the Administrative Law Judge's decision." AR 2. Nevertheless, given the recommended disposition of this case, the Court sees no reason why, upon remand, these additional records should not become part of the administrative record. See, e.g., Emerson v. Comm'r of Soc. Sec., No. 12-Civ-6451 (PAC) (SN), 2014 WL 1265918, at *19 (S.D.N.Y. Mar. 27, 2014) (order adopting report and recommendation). Accordingly, on remand, the Commissioner must consider this supplemental evidence (AR 521-608) in evaluating Plaintiff's claims.

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion for judgment on the pleadings (ECF No. 24) be denied, Plaintiff's motion (ECF No. 26) be granted, and the case remanded to the Agency for further proceedings consistent with this opinion.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of Court with extra copies delivered to the chambers of The Honorable Kenneth M. Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

Dated: May 4, 2017
White Plains, New York

**SO ORDERED**

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York